ENTER NO JS-6 SEND

FILED
CLERK, U S DISTRICT COURT

FEB 1 6 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

9

10

11

| | |
|---|---|
| TZIGHE MESFUN, | ) CASE NO. CV 03-02182 MMM (RNBx) |
| Plaintiff, | ) |
| vs. | ) ORDER RE PLAINTIFF'S MOTION IN LIMINE |
| BESERAT HAGOS, ABRAHA BHATA, all individually and dba, and DOES 1 through 10, inclusive, | ) |
| Defendants. | ) |





Plaintiff Tzighe Mesfun, a native of Eritrea, filed this action against defendants Beserat Hagos and Abraha Bahta alleging, *inter alia*, that defendants forced her to work as a domestic servant in their home from September 1998 to August 2001.[1]  Plaintiff alleges that she came to the United States in the belief that she was going to be a nanny to defendants' two children.[2]  Instead, plaintiff contends, defendants forced her to work long hours, seven day a week, performing domestic services in their home.[3]  Defendants allegedly used express and implied

---

[1]Complaint, ¶ 16.

[2]*Id.*, ¶ 17.

[3]*Id.*, ¶ 16.

threats of physical force and harm to prevent plaintiff from escaping,[4] denied her adequate medical care, and prohibited her from practicing her religion.[5] Plaintiff contends that she suffered extreme emotional trauma as a result of defendants' conduct, and even contemplated suicide.[6] Defendants allegedly paid plaintiff only $8,000 for the three years' work she performed.[7]

Defendants, who are also natives of Eritrea, maintain that they invited plaintiff to their home to participate in the wedding of a family member. They assert that, when the wedding was cancelled, plaintiff chose to remain in the United States because of a war in her homeland. Although not related to plaintiff by blood, defendants contend they treated her like family due to "fictive kinship," a concept prevalent in Eritrean culture. Defendants also assert they supported plaintiff's daughter in Eritrea financially.

Plaintiff alleges claims for involuntary servitude; violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq.; violations of the California Labor Code; false imprisonment; invasion of privacy; fraud; assault; intentional infliction of emotional distress; negligent infliction of emotional distress; negligent supervision; and negligence per se. Plaintiff has filed six motions *in limine*, seeking to exclude the testimony of five witnesses defendants have designated as experts. Plaintiff also seeks to limit defendants' experts to rebuttal testimony only.

# I. DISCUSSION

## A.    Legal Standard Governing The Admissibility Of Expert Testimony

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. The rule sets forth three distinct but related requirements: "(1) the subject matter at issue must be beyond the common knowledge of the average layman; (2) the witness must have sufficient

---

[4]*Id.* ¶ 18.

[5]*Id.* ¶¶ 19-20.

[6]*Id.* ¶ 21.

[7]*Id.* ¶ 22.

1  expertise; and (3) the state of the pertinent art or scientific knowledge permits the assertion of a

2  reasonable opinion." *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002); see also

3  *United States v. Morales*, 108 F.3d 1031 (9th Cir. 1997).

4  　　In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme

5  Court held that "Federal Rule of Evidence 702 imposes an obligation upon a trial judge to 'ensure

6  that any and all scientific testimony . . . is not only relevant, but reliable.'" *Id.* at 589.   The

7  Court articulated a two-step inquiry for determining whether scientific evidence or testimony is

8  admissible.   "First, the trial court must make a 'preliminary assessment of whether the reasoning

9  or methodology underlying the testimony is scientifically valid and of whether that reasoning or

10 methodology properly can be applied to the facts in issue.'" *Finley*, *supra*, 301 F.3d 1008

11 (quoting *Daubert*, *supra*, 509 U.S. at 592-93).   "Second, the court must ensure that the proposed

12 expert testimony is relevant and will serve to aid the trier of fact." *Id.*[8]

13 　　Under the reliability prong, a court should consider a non-exhaustive list of factors in order

14 to determine whether expert testimony is sufficiently reliable to be admitted into evidence.   These

15 include: (1) whether the theory or technique can be, or has been, tested; (2) whether it has been

16 subjected to peer review and publication; (3) whether it has a known or potential rate of error;

17 and (4) whether it has been generally accepted by the scientific community. *Daubert*, *supra*, 509

18 U.S. at 593-94.   The Court in *Daubert* emphasized that the analysis is a "flexible" one, and that

19 its "overarching subject" is the "evidentiary relevance and reliability . . . of the principles that

20 underlie a proposed submission." *Id.* at 594-95.   In *Kumho Tire Co., Ltd. v. Carmichael*, 526

21 U.S. 137 (1999), the Court clarified that the district court's "basic gatekeeping obligation . . .

22 applies to all expert testimony," not just scientifically-based testimony. *Kumho*, *supra*, 526 U.S.

23 at 147.   Where expert testimony is based on specialized, rather than scientific, knowledge, the

24 *Daubert* factors are not intended to be exhaustive or unduly restrictive. *Sullivan v. United States*

25 *Department of Navy*, 365 F.3d 827, 834 (9th Cir. 2004).   Rather, "far from requiring trial judges

26

27 　　　[8]The court refers to these requirements respectively as the "reliability prong" and the "fit

28 prong."

3

1  to mechanically apply the *Daubert* factors – or something like them – to both scientific and

2  non-scientific testimony, *Kumho Tire* heavily emphasizes that judges are entitled to broad

3  discretion when discharging their gatekeeping function." *United States v. Hankey*, 203 F.3d

4  1160, 1168 (9th Cir. 2000). A "'trial court not only has broad latitude in determining whether

5  an expert's testimony is reliable, but also in deciding *how* to determine the testimony's

6  reliability.'" *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004)

7  (quoting *Elsayed Mukhtar v. Cal. State University Hayward*, 299 F.3d 1053, 1064 (9th Cir. 2002)

8  (emphasis original)).

9      If a court determines that an expert's testimony is reliable, it must proceed to the fit prong

10  of the *Daubert* analysis, and determine if the expert's testimony will assist the trier of fact. See

11  *Daubert*, *supra*, 509 U.S. at 591. "Expert testimony assists the trier of fact when it provides

12  information beyond the common knowledge of the trier of fact." *Finley*, *supra*, 301 F.3d 1008.

13  Although the Supreme Court in *Daubert* "recognized that the 'fit' requirement 'goes primarily to

14  relevance,'" it did not intend the second prong of the inquiry be "merely a reiteration of the

15  general relevancy requirement of Rule 402." *Daubert v. Merrell Dow Pharms. Inc.*, 43 F.3d

16  1311, 1321 n. 17 (9th Cir. 1995). Rather, because expert testimony carries special dangers for

17  the fact-finding process, courts must exclude it under Rules 702 and 403 "unless they are

18  convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not

19  mislead the jury." *Id.* at 1321, n. 17.

20      **B.      Dr. Tricia Redeker Hepner, Ph.D.**

21      Plaintiff first seeks to exclude the testimony of defendants' cultural expert, Dr. Tricia

22  Redeker Hepner. Plaintiff argues that Dr. Redeker Hepner seeks to offer inadmissible legal

23  opinion and cultural generalizations about Eriteans, and that her testimony fails to meet the

24  reliability standard established by the Supreme Court in *Daubert*. Plaintiff also argues that

25  because she is one of four cultural experts defendants intend to call, Dr. Redeker Hepner's

26  testimony will be unduly cumulative under Rule 403 of the Federal Rules of Evidence.

27  Defendants counter that Dr. Redeker Hepner's testimony is relevant to place the facts of the case

28  "'in light of the cultural and social patterns typical of Eritreans; the political, economic, and social

4

1   conditions within Eritrea; and the kinds of relationships Eritreans in the US maintain with their

2   extended kin group and close friends in Eritrea.'"[9] They assert that because Dr. Redeker Hepner

3   will provide a unique perspective on the interaction between Eritrean and American culture, her

4   testimony will not be cumulative and should be allowed.[10]

## 1.   Dr. Redeker Hepner's Qualifications

6       Dr. Redecker Hepner received a Bachelor of Arts degree in anthropology from Columbia

7   University in 1996, a Masters degree in anthropology from Michigan State University in 2000,

8   and a Ph.D. in anthropology from Michigan State in 2003.[11]  Her doctoral dissertation, titled

9   *Eritrea and Exile: Trans/Nationalism in the Horn of Africa and the United States*, analyzed the

10  relationship between Eritrean communities in the United State and the nationalist war of

11  independence in Eritrea (1961-1991), as well as the development of the Eritrean state. Dr.

12  Redeker Hepner's Rule 26 report states that she has traveled to Eritrea on three occasions.  In

13  1995, she spent two months living in the semi-rural village of Nefasit, where she worked as a

14  volunteer on a reforestation program run by the Eritrean government, and taught English to high

15  school students.  In 1998, Dr. Redeker returned to Eritrea to study the Tigrinya language at the

16  University of Asmara on a Title VI fellowship; she was evacuated by the United States

17  government in May-June of that year, however, due to the escalating border war between Eritrea

18  and Ethiopia.  In 2001, Dr. Redeker Hepner spent six months in Eritrea doing fieldwork for her

19  doctoral dissertation.[12]

20      In addition to her education and experience in Eritrea, Dr. Redeker Hepner has served as

21  Secretary of the International Eritrean Studies Association, and has presented numerous papers

22  on Eritrea and Ethiopia at scholarly conferences.  She has won several research grants to study

23  _____

24  [9]Defendants' Opposition To Plaintiff's Motion In Limine To Exclude Defendants' Cultural
    Expert Tricia Redeker Hepner, ("Defs.' Redeker Hepner Opp.") at 5.
25

26  [10]*Id.* at 9.

27  [11]*Id.*, Exh. A (Curriculum Vitae of Tricia Marie Redeker Hepner).

28  [12]*Id.*, Exh. A (Rule 26 Report, Tricia Redeker Hepner, Ph.D.) at 1-2.

1   Eritrean and Ethiopian issues, and has published scholarly essays and op-ed articles on the

2   cultural, historical and political dynamics of both countries.[13] Dr. Redeker Hepner states that

3   because the major topic of her doctoral dissertation was the cultural, political and economic

4   linkages that Eritreans retain with one another whether residing in the United States or Eritrea,

5   she asserts that she is qualified to testify about certain Eritrean social and cultural practices that

6   are relevant in this case.[14]

7         **2.    Dr. Redeker Hepner's Opinions**

8        In both her original and supplemental report, Dr. Redeker Hepner states that she intends

9   to offer expert testimony on the following subjects: (1) the nature of Eritrean kinship relationships

10   and terminologies, including blood relationships, relationships between different kin groups, and

11   what anthropologists refer to as "fictive kin," in which people are considered family even when

12   no blood relationship exists;[15] (2) the respect accorded elders in Eritrean culture;[16] (3) the extensive

13   participation of family and close friends in one another's life events, such as weddings, baptisms,

14   or funerals, including travel out of Eritrea to locations abroad;[17] (4) the practice of welcoming and

15   incorporating guests into households for extended periods of time, even when resources or space

16   are scarce, and the reciprocity guests offer by helping their hosts with common household tasks;[18]

17   (5) the common practice of remitting funds and material goods, either through bank transfers or

18   physical travel, to friends and relatives in Eritrea during times of economic hardship and/or times

19   of political instability;[19] (6) the fact that it is not unusual for older traditional-minded Eritrean

20

21      [13]*Id.* at 1.

22      [14]*Id.* at 2.

23      [15]*Id.* at 2-4.

24      [16]*Id.* at 4-5.

25

26      [17]*Id.* at 5-6.

27      [18]*Id.* at 6-7.

28      [19]*Id.* at 7-8.

1    people, especially women, to experience feelings of disempowement, disorientation, and even

2    isolation when immersed in American society;[20] (7) the fact that most, if not all, Eritrean people

3    speak multiple languages;[21] and (8) the fact Eritreans are just as capable of understanding and

4    utilizing technology as other peoples.[22]

5              **3.    Whether Dr. Redeker Hepner's Testimony Is Reliable**

6         Plaintiff argues that Dr. Redeker Hepner's testimony is unreliable because she is not

7    qualified to offer the opinions to which she intends to testify.  Although plaintiff concedes that

8    Dr. Redeker Hepner has expertise and experience in matters related to Eritrea, she asserts that Dr.

9    Redeker Hepner seeks to testify on matters beyond the scope of her scholarly research.  Plaintiff

10   contends that Dr. Redeker Hepner's testimony is based on anecdotal evidence she gathered while

11   visiting Eritrea and interacting with Eritreans during her study of other issues related to Africa

12   and Eritrea, and thus that it does not meet the *Daubert* standard for reliability.

13        Rule 702 provides, in relevant part, that "[i]f . . . other specialized knowledge will assist

14   the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as

15   an expert by knowledge, skill, experience, training, or education, may testify thereto in the form

16   of an opinion or otherwise."  See FED.R.EVID. 702.  A witness may qualify as an expert because

17   of any one, or a combination, of the factors listed in Rule 702.  See *Exum v. General Electric*

18   *Co.*, 819 F.2d 1158, 1163 (D.C. Cir. 1987) ("[R]ule [702] does not require the expert to have

19   personal familiarity with the subject of his testimony; 'experience' is only one among the five

20   different ways to demonstrate an expert is qualified"); *Friendship Heights Assoc. v. Vlastimil*

21   *Koubek*, 785 F.2d 1154, 1159 (4th Cir. 1986) ("Rule 702 further provides that a witness may be

22   qualified as an expert on the grounds of 'knowledge, skill, experience, training, or

23   education . . . .' [T]he use of the disjunctive indicates that a witness may be qualified as an

24   expert on any one of the five listed grounds").  "[A] trial court has wide discretion in determining

---

26   [20]*Id.*, Exh. A (Rule 26 Report-Supplemental Information, Tricia Redeker Hepner, Ph.D.).

27   [21]*Id.*

28   [22]*Id.*

7

1  whether a witness is qualified to testify as an expert." *People v. Cepeda*, 851 F.2d 1564, 1566

2  (9th Cir. 1988).

3      Here, the court finds that Dr. Redeker Hepner's knowledge, experience and education

4  qualify her to offer an expert opinion regarding the political, cultural, social, and economic ties

5  that Eritreans in the United States maintain with their homeland. Although Dr. Redeker Hepner's

6  dissertation analyzed such connections in the context of the nationalist war of independence, she

7  represents that such links were a major subject of her investigation, and that she conducted

8  intensive field research on the topic for eighteen months. Dr. Redeker Hepner's report indicates

9  that Eritreans have a complex kinship structure that traces blood relatives agnatically, or through

10 the male line, as far back as seven generations. She reports that this kinship structure is also

11 linked to land and residence, in the sense that different kin groups which live in the same

12 circumscribed community for many generations develop a broader sense of kinship that extends

13 beyond blood relations. Dr. Redeker Hepner represents that this broader sense of kinship was

14 reinforced by the political culture of the country during the war of independence, when Eritreans

15 were encouraged to refer to one another in kinship terms to foster national cohesion.[23]  The

16 court's review of Dr. Redeker Hepner's curriculum vitae demonstrates that she has written and

17 lectured extensively on various aspects of Eritrean politics, culture and community. Her areas

18 of expertise and study are clearly intertwined with, if not directly parallel to, the opinions she

19 intends to offers in this case.[24]

20      The Ninth Circuit has recognized that, where relevant, an anthropologist or sociologist may

21  ──────────────

22      [23]*Id.*, Exh. A (Redeker Hepner Rule 26 Report) at 2-3.

23      [24]At the hearing, plaintiff's counsel argued that the area of Dr. Redeker-Hepner's expertise
    is Eritrean political culture, not fictive kinship. This argument is unpersuasive. Although Dr.
24  Redeker-Hepner's studies have not focused solely on fictive kinship, it is clearly an issue she has
    examined during the course of her research. For example, Dr. Redeker-Hepner states that one
25  topic of her research has been the kinds of relationships Eritreans in the United States maintain
    with their relatives in Eritrea. She states that, during the course of her study, she learned that she
26  could not limit her analysis to a "kin group" defined by western assumptions. Rather, she had
    to include people who were not related by blood, but who "were close friends who viewed one
27  another as kin, behaved as kin, and referred to one another in kinship terms." ( *Id.* at 3.)
28

8

1  testify generally about the cultural traits and behavior pattern of certain groups of people based

2  on general expertise and study of the culture. In *Vang v. Xiong*, 944 F.2d 476 (9th Cir. 1991),

3  plaintiffs alleged that a Washington state employee had raped them on multiple occasions, each

4  time relying on the pretext of an employment opportunity. *Id.* at 478. The Ninth Circuit held

5  that district court did not abuse its discretion when it permitted anthropologist Marshall Hurlich

6  to testify generally regarding the role of women in Hmong culture, and the nature and effect of

7  long-term Hmong reliance on governmental agencies for support, as the testimony was relevant

8  to explain plaintiffs' seemingly inexplicable behavior of continuing to have contact with the

9  defendant after he raped them. *Id.* at 481-82 & n. 3. The court noted that Hurlich was qualified

10 to testify because his testimony "derived form his expertise as an anthropologist and his study of

11 the Hmong." *Id.* at 482.

12      Similarly, in *Scott v. Ross*, 140 F.3d 1275 (9th Cir. 1998), plaintiff brought a civil rights

13 action against members of a non-profit cult awareness program that abducted and held him captive

14 for five days in order to "deprogram" him. *Id.* at 1279. The Ninth Circuit held that the district

15 court did not abuse its discretion in permitting plaintiff to offer expert testimony regarding the

16 origin and general practices of the "anti-cult movement," and the history and practices of

17 deprogramming. It concluded that plaintiff's expert, a sociology professor who had studied and

18 written about the anti-cult movement for 19 years, was qualified to offer such testimony. *Id.* at

19 1286.

20      Plaintiff's effort to equate Dr. Redeker Hepner's qualifications with those of the expert in

21 *Jinro America Inc. v. Secure Investment, Inc.* 266 F.3d 993 (9th Cir. 2001) is unpersuasive. In

22 *Jinro*, a South Korean corporation brought a breach of contract claim against an American

23 businessman and certain companies he operated. Although plaintiff alleged that the contract

24 involved the sale of frozen chicken, defendants maintained that the agreement was a sham meant

25 to conceal a high risk investment program that violated South Korea's currency regulations. *Id.*

26 at 996. As part of their defense, defendants called David Herbert Pelham to testify as an expert

27 on Korean law and the business practices of Korean government, particularly their alleged

28 propensity to engage in fraudulent activities such as the avoidance of currency laws. Pelham, who

1  had no formal education or training in law and business or as a cultural expert, was the general

2  manager of the Pinkerton Detective Agency's office in Korea, and had provided "commercial

3  security" to non-Korean corporations doing business in Korea for more than four years. Prior

4  to his employment with Pinkerton, Pelham had been trained as an investigator with the United

5  States Air Force Office of Special Investigations, and had overseen the office that investigated

6  Korean companies doing business with the Air Force.  Pelham's other purported qualifications

7  were that he had "served five tours of duty in Korea," lived there for approximately twelve years,

8  and married a Korean woman.  *Id.* at 1002.  The court noted that Pelham's testimony consisted

9  entirely of generalizations about Korean business attitudes, and did not rely on any research, study

10  or empirical data.  Rather, he offered anecdotal references based on his own personal experience.

11  *Id.* at 1004.  As a result, it held, Pelham should not have not have been permitted to testify as an

12  expert:

13  > "Pelham purported to be an expert on Korean business culture and practices,

14  > particularly with regard to Korean currency laws and the propensity of Korean

15  > businesses to evade them through various illegal schemes.  In actuality, his

16  > qualifications to render such opinion testimony were glaringly inadequate,

17  > amounting to little more than the limited perspective of a professional investigator

18  > whose work experience had exposed him to instances of corrupt business behavior.

19  > He did not have the legal, business or financial expertise to evaluate the substance

20  > of the Jinro transaction.  He had no education or training as a cultural expert

21  > generally, or as an expert on Korean culture specifically.  He was not a trained

22  > sociologist or anthropologist, academic disciplines that *might* qualify one to provide

23  > reliable information about the cultural traits and behavior patterns of a particular

24  > group of people of a given ethnicity or nationality."  *Id.* at 1005-06 (emphasis

25  > original).

26  Unlike Pelham, who had no formal training or education, Dr. Redeker Hepner is a

27  anthropologist with extensive expertise in Eritrean culture.  The fact that her expert reports

28  include some anecdotal references does not detract from the substantial amount of time she has

10

1   dedicated to the study of Eritrean society, and the numerous scholarly articles she has published

2   and thus subjected to peer review.  Indeed, it appears that what plaintiff characterizes as a lack

3   of reliability is more properly described as a lack of relevance – i.e., an assertion that most of Dr.

4   Redeker Hepner's opinions are not the proper subject of expert testimony.  See *United States v.*

5   *Webb*, 115 F.3d 711, 717 (9th Cir. 1997) (Jenkins, J., concurring in judgment) ("Rule 702

6   recognizes that a witness may be an expert, and that a witness may have an opinion, but that it

7   may not be . . . helpful to the trier of fact"), abrogation on other grounds recognized in *Hankey*,

8   *supra*, 203 F.3d 1160.  The court accordingly finds that Dr. Redeker Hepner is qualified to offer

9   opinions regarding Eritrean culture, and that her testimony on the subject is sufficiently reliable.

10  It thus turns to an evaluation of the relevance of the testimony.

11  **4.      Whether Dr. Redeker Hepner's Testimony Is Relevant**

12          Under the fit prong of *Daubert*, the court must determine if an expert's testimony will

13  assist the trier of fact.  Evidence that is not beyond the common knowledge of the trier of fact is

14  will not be of assistance and is therefore not relevant.  See *Finley*, *supra*, 301 F.3d 1008.

15  Similarly, evidence that does not assist the trier of fact in understanding the evidence or

16  determining a fact in issue is not relevant.  *New Mexico v. General Electric Co.*, 335 F.Supp.2d

17  1266, 1295 (D.N.M. 2004).  Here, several of the opinions defendants intend to elicit from Dr.

18  Redeker Hepner fail on one, if not both, grounds.

19          Dr. Redeker Hepner opines, for instance, that in Eritrea, a person's authority in the family

20  or community correlates with his or her age.  Because plaintiff is older than defendants, she

21  concludes that it would have been culturally atypical for defendants to treat plaintiff with

22  disrespect.[25]  Whether or not most Eritreans would have treated plaintiff with respect is simply

23  not probative of the manner in which defendants treated her.  See *Jinro*, *supra*, 266 F.3d at 1011

24  (Wallace, J. concurring) ("Pelham's testimony was irrelevant and inadmissible because it sheds

25  no light on Jinro's activities in this case. . . .  Had Jinro attempted to present evidence that the

26  majority of Korean businessmen are ethical and scrupulously honest, relevancy would surely be

27  _____

28          [25]*Id.*, Exh. A (Redeker Hepner Rule 26 Report) at 4-5.

11

1   lacking"). Equally lacking in relevancy is Dr. Redeker Hepner's assertion that most Eritreans

2   speak multiple languages and are as capable of understanding and utilizing technology as other

3   peoples. Although defendants do no identify how this proposed testimony relates to the case, they

4   presumably intend to offer it to rebut assertions by plaintiff that her own linguistic and

5   technological abilities were limited. What other Eritreans know is simply not relevant to whether

6   plaintiff possesses the same knowledge.

7        Other aspects of Dr. Redeker-Hepner's testimony will not assist the trier of fact simply

8   because they are not beyond the common knowledge of the jury. The fact that immigrants often

9   experience feelings of disempowerment, disorientation, and isolation is a concept that jurors can

10  understand without the assistance of an expert. So too is the fact that many Eritrean immigrants

11  living in this country send financial assistance to those who remain in Eritrea, as this is a common

12  pattern for many immigrant populations living in the United States. Finally, testimony about the

13  fact that Eritreans often travel long distances to participate in important life events is not beyond

14  the common experience of the jury, as there is no showing that Eritreans differ in this respect

15  from other cultures.

16       Portions of Dr. Redecker's Hepner testimony, however, would assist the trier of fact. The

17  concept of fictive kinship, for example, is clearly beyond the common knowledge of most

18  American jurors, and without explanation, could be confusing to them.[26] Expert testimony on this

19  _____

20       [26]At the hearing, plaintiff's counsel argued that there is no evidence defendants adhered
    to the concept of fictive kinship in their relationship with plaintiff. To the contrary, it is clear that
21  defendants intend to testify they invited plaintiff to their home, and treated her as a member of
    their family for reasons that are consistent with the concept of fictive kinship. The fact that
22  plaintiff disputes this does not mean that there is no evidentiary support for Dr. Redeker-Hepner's
23  expert opinion. See *United States v. Barnette*, 800 F.2d 1558, 1568-69 (11th Cir. 1986) ("Agent
    Knee may have been selective in relying on certain evidence while rejecting other evidence, but
24  that was within his domain as an expert witness"), cert denied, 480 U.S. 935 (1987). Here,
    defendants will provide sufficient evidence to support Dr. Redeker-Hepner's testimony regarding
25  fictive kinship. See *Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999) ("Expert
26  testimony, however, is inadmissible when the facts upon which the expert bases his testimony
    contradict the evidence"); *Toucet v Maritime Overseas Corp.*, 991 F.2d 5, 10 (1st Cir. 1993)
27  ("While a hypothetical should include only those facts supported by the evidence, . . . the record
28  here indicates that sufficient facts existed to support the challenged hypothetical").

1   subject might help the trier of fact understand why plaintiff allegedly traveled a great distance to

2   attend the wedding of a person she had never met, and to whom she was not related by blood.

3   See *Vang, supra,* 944 F.2d at 481 ("The testimony was relevant to assist the trier of fact to

4   understand certain behavior that might otherwise be confusing"); see also *Jinro, supra,* 266 F.3d

5   at 1009 ("[T]he nature and purpose of the cultural testimony in *Vang* was quite different from

6   Pelham's.  There the expert provided an academic, noninflammatory explanation of the Hmong

7   culture in order to explain the seemingly inexplicable behavior of the two women plaintiffs in

8   repeatedly submitting to rape by a government official").  Such testimony would also offer context

9   explaining why defendants allegedly extended a wedding invitation to a complete stranger, took

10  her into their home, and provided financial assistance to her daughter.

11          Likewise, Dr. Redeker Hepner's testimony regarding Eritreans' hospitality and the manner

12  in which household guests reciprocate their hosts' hospitality by performing household tasks could

13  be of assistance to jurors.   Although, as Dr. Redeker Hepner notes, the concepts of hospitality

14  and reciprocity are not foreign to American culture, her proposed testimony regarding the

15  different emphasis Eritreans place on hospitality, and the manner in which they welcome guests

16  into their homes for extended periods of time, could serve to explain some of the evidence in the

17  case for jurors.

18          Therefore, the court will permit Dr. Redeker Hepner to testify generally regarding Eritrean

19  kinship relationships, and how these relationships are commonly reflected in ties between

20  Eritreans living in the United States and those living in Eritrea.  It will also permit her to opine

21  regarding the importance of hospitality in Eritrean culture, and the reciprocity that attends such

22  hospitality.  Like the district court in *Vang,* the court will limit Dr. Redecker Hepner's testimony

23  to Eritrean kinship and attitudes toward hospitality and reciprocity in general; she may not draw,

24  or suggest, a casual connection between these concepts and the actions of the parties in the instant

25  case.  See *Vang, supra,* 944 F.2d at 482 ("The testimony was prejudicial to Xiong because it

26  supported plaintiff's assertions that he raped them.  It was not, however, *unduly prejudicial*

27  because of its limited scope and its direct relevance to the issues of the case") (emphasis

28  original)); see also *Jinro, supra,* 266 F.3d at 1009 ("[In *Vang,*] we held this cultural testimony

1  was properly admitted in the district court's discretion.  We made particular note, however, of

2  several circumstances – not present here – that informed our decision.  First, the district court

3  limited the scope of the testimony, both in its pretrial ruling on admissibility and in sustaining

4  defendant's objection when plaintiffs tried to expand upon this limited scope at trial. . .").  Nor

5  may she testify that a party's specific behavior was either culturally typical or atypical.  With

6  these limitations, plaintiff's motion to exclude the testimony of Dr. Redeker-Hepner is denied.

7      **C.**    **Dr. John C. Rude, Ph.D.**

8         Plaintiff next seeks to exclude the testimony of Dr. John C. Rude, one of defendants' three

9  remaining cultural experts.  Much as she argued respecting Dr. Redecker Hepner's proposed

10  testimony, plaintiff contends that Dr. Rude seeks to offer inadmissible cultural generalizations and

11  stereotypes about Eritreans that fail to satisfy *Daubert*.  Plaintiff also argues that Dr. Rude's

12  testimony is unduly cumulative, as it will reiterate much of the testimony to be offered by

13  defendants' other cultural experts.  Defendants counter with arguments that are identical to those

14  they made with respect to Dr. Redecker Hepner.  Specifically, they assert that Dr. Rude's

15  testimony is relevant to place the facts of the case "'in light of the cultural and social patterns

16  typical of Eritreans; the political, economic, and social conditions with Eritrea; and the kinds of

17  relationships Eritreans in the US maintain with their extended kin group and close friends in

18  Eritrea.'"[27] Defendants also argue that because he will provide a unique perspective on the

19  interaction between Eritrean and American culture, Dr. Rude's testimony will not be cumulative.[28]

20      **1.**    **Dr. Rude's Qualifications**

21         Dr. Rude is currently employed as the Director of Faculty Grants and Assistant Professor

22  at East Los Angeles College in Monterey Park, California.  He earned a Ph.D. in international

23  education, with a specialization on Africa, from the University of Oregon in 1973.[29]  From

24

25        [27]Defendants' Opposition To Plaintiff's Motion In Limine To Exclude Defendants' Expert

26  John C. Rude, ("Defs.' Rude Opp.") at 5.

27        [28]*Id.* at 9.

28        [29]*Id.*, Exh. A (Expert Report of John C. Rude) at 1.

September 1962 to July 1964, Dr. Rude served as a Peace Corps volunteer in Eritrea, then a part of Ethiopia. Dr. Rude states that, during Eritrea's struggle for independence, he participated in meetings of the Eritrean People's Liberation Front in the United States. He also states that he has made presentations about Eritrean culture to the World Affairs Council of Los Angeles, the National Peace Corps Association, and in articles in the *Humorist Magazine*, the *Los Angeles Times* and the *Portland Oregonian*. In addition to his time in the Peace Corps., Dr. Rude has visited Eritrea on four occasions since it gained independence, leading tours of the country in 1995, 1996 and 1997.[30] Dr. Rude is currently a member of the Tesfa Delina Foundation, "an organization concerned with Eritrean people in U.S.A. and around the world, and the issues faced by individuals or groups as a result of their being exiled."[31] In 1999, Dr. Rude received an "Outstanding Service Award" from the Association of Eritrean Professionals in Development.[32]

## 2. Dr. Rude's Opinions

Dr. Rude's expert report indicates that he intends to offer testimony on the following subjects: (1) that "[i]n Eritrea, (as in much of Africa) 'families' are broadly defined by blood kinship, place of origin, religion and claim;"[33] (2) that "[t]he practice of sending relatives or acquaintances from 'back home' to attend weddings in the United States is widespread;"[34] (3) that "Eritreans who come from the highland regions adhere to homogenous cultural values, some of which are reflected in this case. The first is the deep respect for elders, who are rarely subjected to abuse;"[35] (4) that suicide "is considered one of the most abhorrent acts an Eritrean can commit – so shameful that it is rarely threatened, attempted – or even mentioned. The plaintiff's

---

[30]*Id.*

[31]*Id.* at 10.

[32]*Id.*

[33]*Id.* at 2.

[34]*Id.*

[35]*Id.*

testimony regarding suicide (or discussing an attempted suicide with relatives in Chicago) does not ring true in a cultural sense;"[36] (5) that "[t]he honesty and generosity of Eritreans towards friends and strangers is legendary;"[37] and (6) that "[t]raditions of sharing and hospitality may involve the exchange of favors."[38]  Dr. Rude also proposes to testify regarding the 1998-2000 border war between Ethiopia and Eritrea and its impact on Eritreans,[39] as well as the contrast between diaspora Eritreans and more recent immigrants to the United States.[40]

### 3.    Whether Dr. Rude's Testimony Is Reliable

With a few exceptions, the testimony Dr. Rude intends to offer overlaps the testimony of Dr. Redecker Hepner.  Dr. Rude also seeks to offer testimony regarding the nature of suicide in Eritrean society, the impact of the 1998-2000 border war with Ethiopia on Eritreans, and differences between more recent Eritrean immigrants to the United States and those who came to this country in the 1970s and 1980s.  The court concludes that Dr. Rude is not qualified to offer such testimony.  Although Dr. Rude's resume indicates an interest in Eritrea, as well as involvement in the Eritrean community in the United States, he is not an anthropologist or sociologist, and has not conducted any research or studies regarding the matters about which he intends to testify.  See *Jinro*, *supra*, 266 F.3d at 1006 ("[Defendants' expert] had no education or training as a cultural expert generally, or as an expert on Korean culture specifically.  He was not a trained sociologist or anthropologist, academic disciplines that *might* qualify one to provide reliable information about the cultural traits and behavior patterns of a particular group of people of a given ethnicity or nationality" (emphasis original)).  Rather, the basis of Dr. Rude's opinions is his personal experience serving as a Peace Corps volunteer in Eritrea in the early 1960s, his

[36]*Id.* at 3.

[37]*Id.*

[38]*Id.*

[39]*Id.* at 4-6.

[40]*Id.* at 7-8.

16

1  four subsequent trips to the country, and involvement in Eritrean organizations and the Eritrean

2  community in the United States.  Such experiences do not provide an adequate foundation for the

3  type of cultural testimony Dr. Rude seeks to offer, and render the testimony unreliable.[41]

4  Additionally, there is no evidence before the court that Dr. Rude was present in Eritrea during

5  the border war with Ethiopia, or that he personally observed the events or population conditions

6  about which he seeks to testify.  Because Dr. Rude has no apparent training in history or any

7  other relevant discipline, he is likewise not qualified to testify to these matters, and his opinions

8  regarding them are unreliable.[42]

9  **4.     Conclusion Regarding Dr. Rude's Testimony**

10         In sum, the court finds that Dr. Rude is not qualified to testify regarding the cultural traits

11  and behavior patterns of Eritreans, the border war between Eritrea and Ethiopia, or the effect of

12  that war on Eritreans, and that his testimony on these subjects would not be sufficiently reliable

13  to assist the trier of fact.  Plaintiff's motion to exclude Dr. Rude's testimony is therefore granted.

14  **D.     Dr. Tekie Fessehatzion, Ph.D.**

15         Plaintiff next seeks to exclude the testimony of Dr. Tekie Fessehatzion, another of

16  defendants' cultural experts.  Plaintiff objections to Dr. Fessenhatzion's testimony mirror those

17  she asserts to the testimony of Drs. Redecker Hepner and Rude.  Plaintiff also argues that many

18  of Dr. Fessehatzion's opinions should be excluded because they are based on "common sense"

19  rather than specialized knowledge.  Defendants counter that Dr. Fessehatzion's testimony is

20  relevant and not cumulative because he is "a prominent member of [the] Eritrean American

21  _____

22  [41]Much of Dr. Rude's testimony regarding the cultural traits of Eritreans, moreover, would
   not assist the trier of fact for the reasons stated earlier with respect to similar proposed testimony
23  by Dr. Redeker Hepner.  Additionally, it would be cumulative of the testimony Dr. Redeker
   Hepner will be permitted to offer.
24

25  [42]Were Dr. Rude qualified to offer testimony regarding the war, the court would find it
   relevant.  Defendants argue that plaintiff chose to remain in the United States because of the war
26  in her homeland.  Testimony regarding the circumstances of the war, as well as the dangers it
   posed, would assist the trier of fact in assessing the weight to be given to defendants' argument.
27  Moreover, because the conflict received little media attention in the United States, it is a subject
   beyond the common knowledge of most jurors.
28

community and a commentator on Eritrean society," and can offer an insider's view of the cultural practices of Eritrean-Americans.[43]

### 1.   Dr. Fessehatzion's Qualifications

Dr. Fessehatzion is currently the Chair of the Department of Economics at Morgan State University, a position he has held since 1991.  He received a Bachelor of Arts degree in economics from the University of Connecticut in 1968, a Masters degree in economics from State University of New York at Binghamton in 1970, and a Ph.D. from the School of Public and International Affairs at the University of Pittsburgh in 1976, with a specialization in economics development.[44]  From September 1976 to June 1980, Dr. Fessehatzion was an Assistant Professor of Afro American Studies at the University of Pittsburgh.  From September 1980 to August 1990, he was an Associate Professor at Jackson State University; he was a Professor at that same university from September 1990 to August 1991.[45]  Dr. Fessehatzion has written extensively on the Eritrea, especially the Eritrean-Ethiopia conflict.  He was a member of the Eritrea Constitutional Commission, which was responsible for drafting the country's first constitution after it gained independence in 1991, and has been a member of the Eritrean-American community in the United States for the last twenty-five years.[46]

### 2.   Dr. Fessehatzion's Opinion

Dr. Fessehatzion's expert report does not clearly identify the opinions he intends to offer.  Rather, it appears to offer a legal definition of "human trafficking" and general commentary regarding the facts of the case.  Defendants' opposition is equally unhelpful, stating only that Dr. Fessehatzion will offer an "insider's view" of the cultural practices of Eritrean-Americans.  The court's review of Dr. Fessehatzion's expert report indicates that his "insider's view" consist

---

[43]Defendants' Opposition To Plaintiff's Motion In Limine To Exclude Defendants' Expert Tekie Fessehatzion, ("Defs.' Fessehatzion Opp.") at 4, 9.

[44]*Id.*, Exh. A ("Vita of Tekie Fessehatzion, Ph.D.").

[45]*Id.*

[46]*Id.*, Exh. A ("Rule 26 Report-Tekie Fessehatzion, Ph.D.") at 1.

largely of unsubstantiated assumptions and personal opinions regarding plaintiff's behavior. Dr. Fessehatzion asserts, for example, (1) that the facts of the case fail to demonstrate defendants engaged in human trafficking, or that plaintiff was a victim of such a practice;[47] (2) that plaintiff may have been swayed by outside forces to take her case to court before her community had a chance to find an amicable resolution to the problem;[48] (3) that there appears to be a marriage of convenience between plaintiff and certain advocacy groups, who will secure publicity and grant money if the suit is successful;[49] (4) that plaintiff had several avenues available to her to bring her situation to the attention of the Eritrean community, or to contact the Eritrean Embassy in Washington, D.C.;[50] (5) that plaintiff imagined self-imprisonment, servitude, and slavery-like practices when there were none;[51] (6) that there is a possibility that plaintiff planned to use the United States legal system to find a way to stay in the country, even if it meant blackmailing the family that had invited her to the United States;[52] and (7) that there is no ground for plaintiff's allegation that she is the victim of human trafficking, involuntary servitude, false imprisonment; or slavery-like practices.[53]

### 3.   Dr. Fessehatzion's Testimony Is Not Reliable Nor Relevant

As the proponents of Dr. Fessehatzion's expert testimony, defendants bear the burden of showing that his testimony meets both the reliability and fit prongs of *Daubert*. *Sanderson v. International Flavors and Fragrances, Inc.*, 950 F.Supp. 981, 993 (C.D. Cal. 1996); see *Lust By and Through Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F.3d 594, 598 (9th Cir. 1996) ("It

---

[47]*Id.* at 2.

[48]*Id.* at 3.

[49]*Id.*

[50]*Id.* at 4.

[51]*Id.* at 5.

[52]*Id.* at 6.

[53]*Id.* at 9.

1   is the proponent of the expert who has the burden of proving admissibility"). Dr. Fessehatzion

2   clearly has expertise in economics and, as an Eritrean who has written on Eritrea and its conflict

3   with Ethiopia, might be qualified to testify to matters of Eritrean culture. His expertise, however,

4   provides no basis for the opinions he intends to offer. Although Dr. Fessehatzion purports to base

5   his opinions on his familiarity with Eritrean culture, his expert report amounts to nothing more

6   than personal opinions and assumptions regarding the facts of the case and the motivations that

7   led to its filing.   Many of the opinions he proffers are nothing more than rank speculation.

8   "Opinions of an expert need not be accepted when they are based on nothing more than personal

9   opinion or belief, instead of an understandable scientific [or experiential] basis." *Thomas v. FAG*

10  *Bearings Corp.*, 846 F.Supp. 1382, 1393 (W.D. Mo. 1994); see also *Chemipal, Ltd. v. Slim-Fast*

11  *Nutritional Foods International Inc.*,350 F.Supp.2d 582, 2004 WL 2998783, * 4 (Dec. 22, 2004)

12  ("testimony of an expert that constitutes mere personal belief as to the weight of the evidence

13  invades the province of the fact-finder"); *Indiana Insurance Co. v. General Electric Co.*,   326

14  F.Supp.2d 844, 847 (N.D. Ohio 2004) (same).   Moreover, Dr. Fessehatzion's testimony would

15  not assist the trier of fact, as jurors are more than capable of drawing their own conclusions about

16  the evidence presented without the benefit of Dr. Fessehatzion's personal interpretation of it. For

17  these reasons, the court finds Dr. Fessehatzion's testimony unreliable. See *Cabrera v. Cordis*

18  *Corp.*, 134 F.3d 1418, 1420 (9th Cir. 1998) (" Under *Daubert*, a district court may admit expert

19  scientific opinion if it qualifies as 'scientific knowledge,' that is, if it has a 'grounding in the

20  methods and procedures of science . . . [and is] more than subjective belief or unsupported

21  speculation'");*United States v. Bighead*, 128 F.3d 1329 (9th Cir. 1997) ("The 'reasoning' or

22  'methodology' of the expert must be examined by the court before the expert may be heard by the

23  jury.   Experts are not to testify to their subjective belief or unsupported speculation.   The

24  relevance and the reliability of their testimony, tested in terms of the principles they apply, must

25  pass muster"); see also *Calhoun v. Yamaha Motor Corp. U.S.A.*, 350 F.3d 316, 321 (3d Cir.

26  2003) (stating that an expert's "testimony must be reliable. In other words, 'the expert's opinion

27  must be based on the "methods and procedures of science" rather than on "subjective belief or

28  unsupported speculation,"'" quoting *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 742 (3d

1  Cir. 1994), and *Daubert, supra*, 509 U.S. at 590); *Curtis v. M&S Petroleum Inc.*, 174 F.3d 661,

2  668 (5th Cir. 1999) (same).   Accordingly, plaintiff's motion to exclude Dr. Fessehatzion's

3  testimony is granted.

4      **E.**    **Dr. Sondra Hale, Ph.D.**

5      Plaintiff also moves to exclude the testimony of Sondra Hale, defendants' final cultural

6  expert. Plaintiff makes the same objections to Dr. Hale's testimony that she advances with respect

7  to defendants' other cultural witnesses, namely, that Dr. Hale seeks to testify regarding cultural

8  stereotypes and generalizations, and that her testimony fail to satisfy *Daubert*'s reliability and

9  relevance standards. Plaintiff and also objects that Dr. Hale intends to testify to legal conclusions.

10  Defendants counter that as an Eritrean anthropologist and a women studies scholar, Dr. Hale is

11  uniquely qualified to place in "proper context . . . the role accorded women elders in Eritrean

12  society."[54]   They also assert that Dr. Hale's testimony is relevant to "place the facts of the case

13  in the context of Eritrean cultural and social patterns, especially as these concepts relate to

14  women."[55]

15      **1.**    **Dr. Hale's Qualifications**

16      Dr. Hale is currently a professor of anthropology and women's studies at University of

17  California at Los Angeles ("UCLA").  Dr. Hale has a Masters Degree in African Studies and a

18  Ph.D. in anthropology, both from UCLA.  She is an expert on the Middle East, North Africa and

19  the Horn of Africa, who in recent years has specialized in politics, culture, gender and religion

20  – especially Islam.  Dr. Hale is past president of the Association for Middle East Women's

21  Studies and was a nominee for President of the Middle East Studies Association.[56]

22      As respects her expertise in Eritrean culture, Dr. Hale represents that she has lived in

23  Eritrea for some five months during three visits in 1994, 1996 and 1999.  She also visited Eritrea

24

---

25      [54]Defendants' Opposition To Plaintiff's Motion In Limine To Exclude Defendants' Expert

26  Sondra Hale ("Defs.' Hale Opp.") at 2.

27      [55]*Id.*

28      [56]*Id.*, Exh. A ("Expert Report of Sondra Hale, Ph.D."), ¶ 2.

in 1966 and again in 1974-75. One of Dr. Hale's most recent works focuses on the role of women's lives post-military demobilization in Eritrea. The majority of her research, however, concerns Sudan, where she lived for six years over the course of three decades. Dr. Hale states that her testimony is based on her experience living in and researching various African and North American societies, specifically Eritrea and Sudan, her academic reading in these areas, and her experiences with her two adopted Eritrean daughters.[57]

## 2.   Dr. Hale's Opinions

Dr. Hale's expert report indicates that she intends to offer testimony on the following subjects: (1) the fact that African (including Eritrean) families are more broadly defined than American families, partially because of putative kinship, i.e., pretending and acting upon the notion that someone is a "blood" relative;[58] (2) the high value placed on hospitality in African (including Eritrean) social networking and family life;[59] (3) the fact that African (including Eritrean) family and social life is characterized by shared rights and obligations;[60](4) the fact that extended families, fictive or putative relatives, and the high value placed on hospitality would, in combination, make it common for Eritreans to behave toward a visitor in the way defendants behaved toward plaintiff; and (5) the fact that defendants treated plaintiff as a host family would treat an old family friend, sharing resources in reciprocal living arrangements.[61]

## 3.   Whether Dr. Hale's Testimony In Reliable

Plaintiff advances several arguments as to why Dr. Hale's testimony is unreliable. Specifically, she argues that Dr. Hale's testimony relies on improper cultural stereotypes, contains improper legal conclusions, and is based on anecdotal experience rather than scientific or

---

[57]*Id.*, ¶¶ 2,4,7.

[58]*Id.*, ¶ 7.

[59]*Id.*, ¶ 8.

[60]*Id.*, ¶ 9.

[61]*Id.*, ¶ 11

22

scholarly inquiry.  Plaintiff also asserts that Dr. Hale's testimony is influenced by her relationship with defendant Beserat Hagos.   As was true of her objections to Dr. Redecker Hepner's testimony, however, plaintiff's assertion that Dr. Hale's testimony is unreliable is more properly characterized as an argument that some of the opinions she seeks to offer are not relevant.  Contrary to plaintiff's suggestion, the fact that the Ninth Circuit in *Jinro* excluded purported expert testimony under Rule 403 because it was nothing more than inflammatory racial stereotyping does not mean that it repudiated all sociological and anthropological testimony.  Indeed, the Ninth Circuit specifically noted that such testimony was not inherently prejudicial, and could be properly admitted in certain cases.  See *Jinro, supra*, 266 F.3d at 1008 ("We do not suggest that expert testimony relating to certain aspects of a defendant's race, ethnicity or nationality can never be admissible.  Testimony about cultural traits or behavior, for example is not *inherently* prejudicial" (emphasis original)).  Moreover, the fact that Dr. Hale testified during her deposition that she believes Hagos is honest and that this was important to her in deciding to testify as an expert does not render her testimony as a whole unreliable.

Indeed, Dr. Hale's qualifications as an expert cannot seriously be challenged.  She is a professional anthropologist who has written on Eritrean culture and conducted five months of field research in the country.  She has researched for many years in nearby Sudan.  Her education, research and scholarship qualify her to offer an opinion regarding certain aspects of Eritrean culture.

### 4.    Whether Dr. Hale's Testimony Is Relevant

Although not identical, Dr. Hale's testimony closely mirrors that of Dr. Redker Hepner.  Her testimony regarding the kinship structure of Eritrean society and the value placed on hospitality in the Eritrean culture are similar to the opinions of Dr. Redeker Hepner on these subjects, and would potentially be of assistance to the trier of fact.  The court will accordingly permit the testimony so long as Dr. Hale does not offer specific opinions regarding the conduct of plaintiff or defendants in this case.  The court agrees with plaintiff, however, that calling two witnesses to testify on these subjects would be cumulative, and consume undue time under Rule 403.  Therefore, defendants may offer the testimony of either Dr. Redeker Hepner or Dr. Hale

on these subjects, but not both.[62]  With these restrictions, plaintiff's motion to exclude Dr. Hale's testimony is denied.[63]

---

[62]Because Dr. Redeker-Hepner has additional expertise respecting the relationships that Eritreans in the United States maintain with persons in their homeland, defendants are not necessarily precluded from calling both witnesses.  At the hearing, however, defense counsel represented that defendants would call Dr. Redeker-Hepner only.

[63]Plaintiff also argues that Dr. Hale's testimony should be excluded because her report was not disclosed until October 1, 2004, months after it was originally due.  Plaintiff argues that after originally designating Dr. Hale as an expert, defendants' prior counsel represented that she had been "dropped" as a witness.  Defendants' new counsel then took the position that Dr. Hale might testify at trial, but failed to produce her expert report in a timely fashion.

Rule 26 requires that parties wishing to call an expert witness disclose the expert's report to their adversary.  FED.R.CIV.PROC. 26(a)(2)(B) ("Except as otherwise stipulated or directed by the court, [a party's expert] disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case . . . , be accompanied by a written report prepared and signed by the witness").  The report must "contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years."  *Id.*

Pursuant to Rule 37, "[a] party that without substantial justification fails to disclose information required by Rule 26(a) . . . shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed."  FED.R.CIV.PROC. 37(c)(1).  Excluding evidence at trial as a sanction for failure to make timely disclosure under Rule 26(e)(1) is "'automatic and mandatory' unless the party can show the violation is 'either justified or harmless.'"  *Miksis v. Howard*, 106 F.3d 754, 760 (7th Cir. 1997); see also *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).  "Two express exceptions ameliorate the harshness of Rule 37(c)(1): The information may be introduced if the parties' failure to disclose the required information is substantially justified or harmless."  *Yeti by Molly, supra*, 259 F.3d at 1106.  The burden of establishing substantial justification and harmlessness is upon the party who failed to make the required disclosure. See *id.* at 1107; *Hirpa v. IHC Hospitals, Inc.*, 149 F.Supp.2d 1289, 1295 (D. Utah 2001).

Although defendants' opposition to plaintiff's motion to exclude Dr. Hale's testimony does not address the timeliness of their Rule 26 disclosure, their opposition to plaintiff's motion to limit all defense experts to rebuttal testimony does.  Defendants note that they gave plaintiff Dr. Hale's expert report more than a week before her deposition, and thus that plaintiff was not prejudiced by its belated disclosure.  Given the continued trial date, the fact that plaintiff had a full opportunity to depose Dr. Hale after receiving her expert report, and the absence of any showing

1    **F.    Catherine Graves**

2        Plaintiff next moves to exclude the testimony of defense expert Catherine Graves. Graves,

3    an economist and financial analyst, is a principal of Wayne H. Lancaster, Inc, an economic and

4    financial consulting firm.[64]  She holds a Bachelor of Science degree in operations research and

5    statistics from California State University, Long Beach ("CSULB"), and a Masters degree from

6    CSULB in business administration, with an emphasis in operations research, finance and human

7    resources management.[65]  Defendants have designated Graves as a rebuttal expert to plaintiff's

8    economic expert, Richard Kakigi.  Plaintiff moves to exclude Graves' testimony on the grounds

9    that (1) her opinion that defendants are entitled to an offset for meals and lodging is irrelevant

10   because such a deduction is not available under state or federal law; (2) her opinion that plaintiff

11   is not entitled to pay for sleep time and unsupervised time is irrelevant and contrary to applicable

12   law; and (3) her household production services testimony regarding the hours plaintiff worked

13   does not satisfy *Daubert*'s requirements.   Plaintiff also argues, unpersuasively, that Graves'

14   testimony should be excluded because she failed to provide meaningful answers during her

15   deposition.

16       **1.    Graves' Testimony Regarding The Weekly Value Of Room And Meals**

17              **Provided To Plaintiff**

18       Plaintiff first objects to Graves' testimony regarding the value of the room and board

19   defendants provided to plaintiff.  As noted, plaintiff has alleged claims for violation of the Fair

20   Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq., and the California Labor Code.  She

21   contends that "[u]nder state and federal law an employer is not entitled to a deduction of wages

22   for meals, lodging or other necessities without first obtaining the voluntary consent of the

23   ────────────────

24   of prejudice by plaintiff, the court finds that defendants have met their burden of demonstrating

25   harmlessness.  Therefore, the court therefore declines to exclude her testimony because of the
     untimely disclosure of her expert report.

26       [64]Plaintiff's Motion In Limine To Exclude Testimony Of Defendants' Expert Catherine

27   Graves ("Pl.'s Graves Motion"), Exh. A, (Expert Report of Catherine Grave's ) at 2.

28       [65]*Id.*

1  employee to the deduction."[66]  As a consequence, she asserts, Graves' testimony on this subject

2  is irrelevant.  Defendants' only response to this argument is the conclusory assertion that the value

3  of room and board is a "fact of consequence."

4        Plaintiff's characterization of California law is correct.   The Industrial Welfare

5  Commission ("ICW") "'is the state agency empowered to formulate regulations (known as wage

6  orders) governing employment in the State of California.'"  *Morillion v. Royal Packing Co.*, 22

7  Cal.4th 575, 581 (2004) (quoting *Tidewater Marine Western, Inc. v. Bradshaw,* 14 Cal.4th 557,

8  576 (1996)).  California Labor Code § 1173 authorizes the IWC "to promulgate orders regulating

9  wages, hours and working conditions throughout the state."  *Ralphs Grocery Co. v. Superior*

10 *Court*, 112 Cal.App.4th 1090, 1097 (2003).  Industrial Welfare Commission Order No. 15-2001,

11 § 10(C) ("Wage Order No. 15-2001"), which governs the wages, hours, and working conditions

12 of persons employed in household occupations,[67] states that "[m]eals or lodging may not be

13 credited against the minimum wage without a voluntary written agreement between the employer

14 and the employee. . . ."  8 CAL. ADMIN. CODE § 11150. subd. 10(C).   Under California law,

15 therefore, defendants may not deduct plaintiff's meals and lodging from her wages in the absence

16 of such an agreement.

17       It is not clear, however, that the same is true under federal law.  29 C.F.R. § 531.30

18 provides: "The reasonable cost of board, lodging, or other facilities may be considered as part

19 of the wage paid an employee only where 'customarily furnished' to the employee.  Not only must

20 the employee receive the benefits of the facility for which he is charged, but it is essential that his

21 acceptance of the facility be voluntary and uncoerced."  The Fifth, Sixth and Eleventh Circuits,

22 however, have held that the requirement set forth in § 531.30 that an employee's acceptance of

23 benefits must be "voluntary and uncoerced" is  inconsistent with the clear language of 29 U.S.C.

24

25 ─────────────────────

26       [66]Motion to Exclude Testimony of Catherine Graves at 4.

27       [67]"Household occupations" are "all services related to the care of persons or maintenance
    of a private household or its premises by an employee of a private householder," including, *inter*
28 *alia*, cooks, house cleaners, maids and housekeepers.  8 CAL. CODE REGS. § 11150, subd. 2(H).

1  § 203(m), and thus that it is an invalid regulation.  See *Herman v. Collis Foods, Inc.*, 176 F.3d

2  912, 918 (6th Cir. 1999); *Donovan v. Miller Properties, Inc.*, 711 F.2d 49, 50 (5th Cir. 1983);

3  *Davis Brothers, Inc. v. Donovan*, 700 F.2d 1368, 1372 (11th Cir. 1983).  These courts have held

4  that the central inquiry is not whether the employee voluntarily accepts room and board from the

5  employer, but whether room and board are customarily furnished by the employer.  See *Herman*,

6  *supra*, 176 F.3d at 918 ("Nothing in § 203(m) indicates that employers must give their employees

7  a choice of whether to accept meals.  Instead, the inquiry focuses on whether the meals are

8  'customarily furnished by' the employer").

9        Although this distinction between state and federal law might be important in some cases,

10  it is not in this case, as defendants do not contend that they had a written agreement with plaintiff

11  or that they "customarily furnished" room and board to their employees.  On the contrary, they

12  contend that they had no employment relationship with plaintiff, and proffer no evidence that they

13  had hired household employees in the past.  Testimony regarding the weekly value of plaintiff's

14  room and meals, therefore, is irrelevant and inadmissible.  FED.R.EVID. 402.  As a result,

15  plaintiff's motion to exclude this aspect of Graves' testimony is granted.

16        **2.      Graves' Testimony Regarding Plaintiff's Ability To Recover Wages For**

17              **Time Spent Sleeping Or Unsupervised**

18        Plaintiff also objects to Graves' proposed testimony that plaintiff is not entitled to recover

19  wages for hours spent sleeping or unsupervised even if she was "on duty."  Plaintiff's description

20  of Graves' testimony is inaccurate.  Graves does not state that plaintiff cannot recover wages for

21  "on duty" hours.  Rather, she challenges Kakigi's assertion that plaintiff was "on duty" twenty-

22  four hours a day.  Both the FLSA and the California Labor Code require that an employer pay

23  an employee minimum wage, and if applicable, overtime wages, for all hours worked.  Although

24  defendants argue that plaintiff was not an employee, it is undisputed that plaintiff performed

25  certain household tasks in defendants' home.  Defendants contend that plaintiff did so voluntarily.

26  They apparently intend to argue, however, that even if plaintiff is found to have been an

27  employee, she is entitled to recover wages only for "hours worked" as that term is used in the

28  FLSA and Wage Order 15-2001.

### a.    Fair Labor Standards Act

"The FLSA requires that employers pay covered employees at least the federal minimum wage for all hours worked, and time and one-half for all hours worked in excess of forty hours in a single work week." *Local 1605 Amalgamated Transit Union, AFL-CIO v. Central Contra Costa County Transit Authority*, 73 F.Supp.2d 1117, 1121 (N.D. Cal. 1999); see *Alvarez v. IBP, Inc.*, 339 F.3d 894, 902 (9th Cir. 2003) ("It is axiomatic, under the FLSA, that employers must pay employees for all 'hours worked'"); see also see 29 U.S.C. §§ 206(a)(1), 207(a)(1). Although the FLSA does not define "hours worked," the courts have developed standards to determine whether an activity constitutes work under the FLSA.[68] *Id.* at 1121; see *Leone v. Mobil Oil Corp.*, 523 F.2d 1153, 1162 (D.C. Cir 1975) ("The concept of 'hours worked' or 'working time,' therefore, has necessarily evolved through caselaw to delineate which employee activities are covered for purposes of minimum wage and maximum hours"). The Supreme Court has stated that "work includes physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer." See *Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590 (1944). This definition includes even non-exertional acts, because an employer may hire a person to do nothing, or to do nothing but wait for something to happen. See *Alvarez, supra*, 339 F.3d at 902 (quoting *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944)). In addition to case law addressing what constitutes work for which an employee must be paid, federal regulations provide guidance as well.[69] *Local 1605 Amalgamated Transit Union, supra*, 73 F.Supp.2d at 1121.

---

[68]The term "hours worked" appears in the FLSA only once. See 29 U.S.C. § 203(o) ("Hours Worked. – In determining for the purposes of sections 206 and 207 of this title the hours for which an employee is employed, there shall be excluded any time spent in changing clothes or washing at the beginning or end of each workday which was excluded from measured working time during the week involved by the express terms of or by custom or practice under a bona fide collective-bargaining agreement applicable to the particular employee").

[69]The Portal-to-Portal Act of 1947 amended the FLSA to exclude the following activities from "hours worked": "(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and (2) activities which are preliminary to or postliminary to said principal activity or activities,

Under the FLSA,

"[a]n employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises. Ordinarily, he may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own. It is, of course, difficult to determine the exact hours worked under these circumstances and any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted. . ." 29 C.F.R. § 785.23.

While the overtime provisions of the FSLA do not apply to domestic live-in servants (see 29 U.S.C. § 213(b)(21)),

"this exemption does not excuse the employer from paying the live-in worker at the applicable minimum wage rate for all hours worked. In determining the number of hours worked by a live-in worker, the employee and the employer may exclude, by agreement between themselves, the amount of sleeping time, meal time and other periods of complete freedom from all duties when the employee may either leave the premises or stay on the premises for purely personal pursuits. For periods of free time (other than those relating to meals and sleeping) to be excluded from hours worked, the periods must be of sufficient duration to enable the employee to make effective use of the time. If the sleeping time, meal periods or other periods of free time are interrupted by a call to duty, the interruption must be counted as hours worked." 29 C.F.R. § 552.102(a).

Plaintiff appears to assert that when there is no agreement between an employer and a live-in worker, the employer must pay the worker wages for twenty-four hours each day. This is not

---

which occur prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities." 29 U.S.C. § 254(a); see *Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 910 (9th Cir. 2004).

1  so.  In the absence of an agreement, the employer must keep precise records of, and pay the

2  worker for, the total number of hours actually worked.[70]  See 29 C.F.R § 552.102(b) ("Where

---

4  [70]Although plaintiff has testified that she worked eighteen hours each day, she contends she
is entitled to be paid wages for twenty-four hours each day because she was on-call during this
entire period.  Whether "on-call" or "waiting " time constitutes compensable working time for
purposes of the FLSA is "particularly challenging."  See *Brigham v. Eugene Water & Electric
Board*, 357 F.3d 931, 935 (9th Cir. 2004).  "[F]acts may show that the employee was 'engaged
to wait,' which is compensable, or they may show that the employee 'waited to be engaged,'
which is not compensable."  *Owens v. Local No. 169, Ass'n of W. Pulp & Paper Workers*, 971
F.2d 347, 350 (9th Cir. 1992) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 137 (1944)); see
also *Brigham, supra*, 357 F.3d at 935 (quoting *Owens*).  Whether an employee will be paid for
"on call" time under the FLSA depends "not [on] the importance of on-call work to the employer,
[but] . . . on the employee and whether he is so restricted during on-call hours as to be effectively
engaged to wait."  *Owens, supra*, 971 F.2d at 354.

    Although the Supreme Court has been reluctant to "lay down a legal formula" to determine
whether waiting time is compensable, it has identified two key factors: (1) the degree to which
the employee is free to engage in personal activities; and (2) any agreements between the parties.
*Owens, supra*, 971 F.2d at 350; see also *Brigham, supra*, 357 F.3d at 936.  The Ninth Circuit
has articulated a non-exhaustive list of factors that can be used to determine whether an employee
is able to use on-call time for personal activities: (1) whether there was an on-premises living
requirement; (2) whether there were excessive geographical restrictions on the employee's
movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time
limit for response was unduly restrictive; (5) whether the on-call employee could easily trade
on-call responsibilities; (6) whether use of a pager could ease restrictions; and (7) whether the
employee actually engaged in personal activities during call-in time.  A court must also consider
any agreement between the parties.  *Owens, supra*, 971 F.2d at 351.

    The rule promulgated by the Administrator of the Wage and Hour Division of the United
States Department of Labor emphasizes the importance of the on-premises living requirement.
See 29 C.F.R § 785.17 It states: "An employee who is required to remain on call on the
employer's premises or so close thereto that he cannot use the time effectively for his own
purposes is working while 'on call.'  An employee who is not required to remain on the
employer's premises but is merely required to leave word at his home or with company officials
where he may be reached is not working while on call."  This rule is not controlling, although
it may be looked to for guidance.  See *Owens, supra*, F.2d at 351, n. 8.  Neither party has made
any attempt to address the relevant factors, and the court cannot make any final assessment as to
the relative merits of their arguments on this point as a result.  Rather, any such determination
will have to await factual findings by the jury at the conclusion of trial.  See *Berry v. County of
Sonoma*, 30 F.3d 1174, 1180 (9th Cir. 1994) ("Whether and to what extent employees are able
to use on-call time for personal activities is a question of fact.  However, whether the limitations
on the employees' personal activities while on-call are such that on-call waiting time would be
considered compensable . . . under the FLSA is a question of law . . ." (internal citations

1   there is a reasonable agreement, as indicated in (a) above, it may be used to establish the

2   employee's hours of work in lieu of maintaining precise records of the hours actually worked");

3   see also 29 C.F.R. § 785.23 ("An employee who resides on his employer's premises on a

4   permanent basis or for extended periods of time is not considered as working all the time he is

5   on the premises"). Because there are factual disputes as to whether plaintiff was on call twenty-

6   four hours a day, Graves may properly testify to the amount of wages plaintiff is entitled to

7   recover under the FLSA based on the number of hours defendants contend plaintiff actually

8   worked. Graves may not, however, offer a legal conclusion as to whether plaintiff is entitled to

9   compensation for the hours she was allegedly on-call.

10                        **b.    Wage Order No. 15-2001**

11          Like the FLSA, Wage Order No. 15-2001 requires that a live-in domestic employee be

12   paid minimum wage for all hours worked. 8 CAL. CODE REGS. § 11150, subd. 4(A). "Hours

13   worked" means the time during which the employee is subject to the employer's control, and

14   includes all time the employee is suffered or permitted to work, whether required to do so or not.

15   8 CAL. CODE REGS. § 11150, subd. 2(H). Unlike the FLSA, however, California law does not

16   exempt live-in domestic workers from state overtime provisions. Wage Order No. 15-2001

17   provides that a live-in employee "shall have at least twelve consecutive hours of free duty during

18   each twenty-four hour workday, and at least three free hours during the twelve hour span of work

19   (the three hours need not be consecutive). 8 CAL. CODE REGS. § 11150, subd. 3(A)-(A)(1). It

20   further provides and that, except in an emergency, no live-in employee shall be required to work

21   more than five days in any one work week without a day off of not less than twenty-four

22   consecutive hours.[71] 8 CAL. CODE REGS. § 11150, subd. 3(B). By mutual agreement between

23   the employer and the employee, an employee may work during the three scheduled off-duty hours

24   or during the consecutive twelve hour off-duty period, provided the employee is compensated at

25

26   omitted)).

27          [71]"'Emergency' means am unpredictable or unavoidable occurrence at unscheduled
28   intervals requiring immediate action." 8 CAL. CODE REGS. § 11150, subd. 2(D).

1   a rate of one and one-half times his or her regular pay.  8 CAL. CODE REGS. § 11150, subd.

2   3(A)(2).  An employee must also be compensated at a rate of one and one-half times the

3   employee's regular pay for any time worked in excess of five days in a work week, and double

4   the employee's regular pay for hours worked in excess of nine hours on the sixth and seventh

5   workdays.  8 CAL. CODE REGS. § 11150, subd. 3(B).

6         Plaintiff argues that employees who sleep at their place of employment are entitled to

7   compensation for their sleep time absent a voluntary written agreement.  In support, she cites

8   *Aguilar v. Assoc. for Retarded Persons*, 234 Cal.App.3d 21 (1991).  There, the court upheld the

9   Division of Labor Standards Enforcement's ("DLSE") interpretation of Industrial Welfare

10  Commission Order No. 5-80 ("Wage Order No. 5-80").[72]  The DLSE had determined that the

11  Association For Retarded Citizens ("ARC"), which operated group homes for mentally disabled

12  persons, was required to pay attendants who worked less than 24-hour shifts for the hours they

13  were required to be on ARC's premises and subject to its control, despite the fact that the

14  employees were permitted to sleep during these hours.  *Id.* at 30.  The court noted that Wage

15  Order No. 5-80 only allowed the employer to exclude meal and sleep time from the daily hours

16  worked of attendants who worked 24-hour shifts, and then only if the employer and employee

17  agreed to exclude such time.  *Id.* at 30, 35.

18        Plaintiff's reliance on *Aguilar* is misplaced.  *Aguilar* involved a wage order that is not at

19  issue in this case, and the DLSE's application of that wage order to a specific situation.  See

20  *Aguilar*, *supra*, 234 Cal.App.3d at 22 ("The department's action amounted to no more than

21  interpretation of the wage order and its application to a specific situation; its interpretation did not

22  create a new rule or policy, but merely construed the words of the wage order").  Here, Wage

23  Order No. 15-2001 specifically contemplates that an employee may be required, as a condition

24  of employment, to live at the place of employment or occupy quarters owned or under the control

25  of the employer.  8 CAL. CODE REGS. § 11150, subd. 10(E).  It does not provide that such a live-

26  ―――――――――

27      [72]"The DLSE 'is the state agency empowered to enforce California's labor laws. including
IWC wage orders.'"  *Morillion*, *supra*, 22 Cal.4th at 581 (quoting *Tidewater*, *supra*, 14 Cal.4th

28  at 561-62).

1   in employee is entitled to compensation for sleep time absent a written agreement.  Rather, it is

2   clear that the wage order contemplates that a live-in employee's sleep time may be considered part

3   of the employee's off-duty hours.[73]  Plaintiff's assertion that she is entitled to recover wages for

4   the hours she spent sleeping, merely because she had no agreement with defendant to exclude such

5   hours, is therefore incorrect.  As a result, in testifying to the amount of wages plaintiff is entitled

6   recover under California law, Graves may properly exclude the number of hours plaintiff spent

7   sleeping, based on defendants' contention that plaintiff was not subject to their control, and thus

8   not working, during those hours.  Graves may not offer a legal conclusion as to whether plaintiff

9   was subject to defendants' control during the hours she was allegedly on-call.

10          In sum, Graves' difference of opinion with Kakigi appears to reflect the parties' conflicting

11

12          [73]As noted, plaintiff contends that because she was on-call twenty-four hours each day, she

13   is entitled to be compensated for the entire period, including the hours she slept.  Under
     California law, that fact that an employee is "on-call" does not necessarily mean that such time
14   constitutes "hours worked"– i.e., time during which the employee is subject to the employer's

15   control.  In interpreting identical definitions of "hours worked" under other wage orders,
     California courts have held that an employee is subject to an employer's control only when she
16   is not permitted to use her time effectively for her own purposes.  See *Morillion*, *supra*, 22

17   Cal.4th at 586 ("We also reject Royal's contention that plaintiffs were not under its control during
     the required bus ride because they could read on the bus, or perform other personal activities.
18   Permitting plaintiffs to engage in limited activities such as reading or sleeping on the bus does not
     allow them to use 'the time effectively for [their] own purposes,'" quoting *Bono Enterprises, Inc.*
19   *v. Bradshaw*, 32 Cal.App.4th 968, 975 (1995)); *Bono Enterprises*, *supra*, 32 Cal.App.4th at 975

20   ("When an employer directs, commands or restrains an employee from leaving the work place
     during his or her lunch hour and thus prevents the employee from using the time effectively for
21   his or her own purposes, that employee remains subject to the employer's control"), disapproved

22   on other grounds in *Tidewater*, *supra*, 14 Cal.4th at 561-62.  In *Madera Police Officers Assn. v.*
     *City of Madera*, 36 Cal.3d 403, 411 (1984), the California Supreme Court adopted a two-step test
23   for determining whether on-call meal breaks for police personnel constituted hours worked under
     a local ordinance.  It stated that the court must first determine whether the restrictions are imposed
24   primarily to fulfill the employer's requirements, and then examine the scope of the restrictions
     and their cumulative effect on the employees' ability to pursue private business during off-duty
25   time.  *Id.* at 410-11.  It is "[t]he level of the employer's control over its employees, rather than
     the mere fact the employer requires the employees' activity, [that] is determinative" in deciding
26   whether on-call duty constitutes hours worked.  See *Morillion*, *supra*, 22 Cal.4th at 587.  As is

27   the case under the FLSA, therefore, whether plaintiff is entitled to compensation under California
     law for the hours she was allegedly on-call is dependent on factual findings by the jury.
28

1   positions regarding plaintiff's duties in defendants' home.  The jury will ultimately determine

2   which party's view of the evidence it accepts.  Because experts may assume facts favorable to the

3   party that hired them, however, Graves' opinion is admissible.  See *Barnette*, *supra*, 800 F.2d

4   at 1568-69.  Therefore, to the extent plaintiff seeks to exclude Graves from testifying as to the

5   amount of wages plaintiff may recover under the FLSA and the California Labor Code based on

6   the number of hours defendants contend plaintiff actually worked, her motion is denied.

### 3.   Graves' Household Production Opinion

8   Plaintiff also moves to exclude Graves' household production opinion, which is based on

9   studies concerning the amount of time spent on housework by household members and the

10   methods for quantifying such time.  Plaintiff contends that such testimony should be excluded

11   because (1) as an economist, Graves lacks the expertise to determine the number of hours worked

12   by plaintiff; (2) jurors are capable of determining the total hours worked based on percipient

13   witness testimony; and (3) Graves' opinion is based on speculation, conjecture and other improper

14   matters.  Defendants counter that Graves will testify only regarding the average amount of time

15   spent on household chores, and the difficulty of keeping accurate records of such time.  On

16   February 11, 2005, the court held *Daubert* hearing, at which it heard testimony from Graves

17   regarding her expected household production testimony.

18   As respects plaintiff's argument that Graves cannot testify regarding the number of hours

19   she worked while in defendants' home, defendants' opposition, as well as Graves' testimony at

20   the hearing, indicate that Graves does not intend to offer such an opinion.  Rather, she intends to

21   testify that time use studies by economists reveal that when individuals rely on a recall method

22   for estimating the time they spend performing household tasks, such a method generally results

23   in an overstatement of the number of hours.[74]  Consequently, the court turns to the balance of

24   ————————————————

25   [74]Reporter's Transcript, February 1, 2005, ("RT") at 11:3-13 ("Q.  And how does time

26   use study apply in this case?  A.  Well, the point of my testimony is to indicate, in general, that
    it's accepted by the time use professionals, those who specialize in the area, that a recall

27   [estimate] is generally an overstatement with a bias towards the unusual kind of activity rather
    than an accurate picture of mundane activities.  So there is an overstatement bias that is generally

28   found in recall method.  The average is very difficult for an individual to really describe after the

1  plaintiff's arguments.

2       **a.   Graves' Household Production Testimony Is Inadmissible**

3            **Hearsay**

4       Under Rule 703 of the Federal Rules of Evidence, "an expert may base his opinion at trial

5  on inadmissible facts and data of a type reasonably relied upon by experts in the field." *United*

6  *v. Gonzales*, 307 F.3d 906, 910 (9th Cir. 2002); see FED.R.EVID. 703 ("If of a type reasonably

7  relied upon by experts in the particular field in forming opinions or inferences upon the subject,

8  the facts or date need no be admissible in evidence in order for the opinion or inference to be

9  admitted"). Experts are permitted to rely on hearsay, including the opinions of other experts, if

10  proper foundation is laid that others in the field would likewise rely on them.[75]   See

11  *Calva-Cerqueira v. United States*, 281 F.Supp.2d 279, 300 (D.D.C. 2003) ("As stated

12  previously, an expert economist may rely on the opinions of other experts"); *Recreational*

13  *Developments of Phoenix, Inc. v. City of Phoenix*, 220 F.Supp.2d 1054, 1063-64 (D. Ariz. 2002)

14  ("Although, as noted above, an expert may rely on the professional studies of other experts, the

15  Court must still determine whether an expert's testimony 'rests on a reliable foundation'").

16       Nonetheless, Rule 703 does not permit an expert witness to circumvent the rules of hearsay

17  by testifying to the opinions of other experts. See *Tokio Marine & Fire Ins. Co. v. Norfolk &*

18  *Western Ry. Co.*, 172 F.3d 44, 1999 WL 12931, * 4 (4th Cir. Jan. 14, 1999) (Unpub. Disp.)

19  ("one expert may not give the opinion of another expert who does not testify"); *United States v.*

20  *Tomasian*, 784 F.2d 782, 786 (7th Cir. 1986) (holding that it was not an abuse of discretion to

21  exclude proffered expert testimony, the court noted that its "conclusion in this regard is not

22  undermined by Federal Rule of Evidence 703's explicit allowance for expert opinion based on

23  hearsay. If Basile would have presented an expert to give an opinion based on hearsay facts, this

24  _____

25  fact, especially as time goes on").

26       [75]Rule 703 provides, however, that "[f]acts or data that are otherwise inadmissible shall

27  not be disclosed to the jury by the proponent of the opinion . . . unless the court determines that
   their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs

28  their prejudicial effect." FED. R.EVID. 703.

1   would be a different case and Rule 703 might be implicated.  Basile, however, only proffered

2   Stone who had no expert opinion whatsoever.  Stone could only relay another's opinion of the

3   price per pound of ivory.  He had no opinion of his own on that matter, on whether price per

4   pound times weight is any measure of a tusk's value, or on any other matter concerning the

5   valuation of antiques, much less ivory antiques.   Rule 703 does not sanction the simple

6   transmission of hearsay; it only permits an expert opinion based on hearsay"); *In re Imperial*

7   *Credit Industries, Inc. Securities Litigation*, 252 F.Supp.2d 1005, 1012-13 (C.D. Cal. 2003)

8   (holding that it was improper for an accountant who was not a residual valuation expert to testify

9   to the information found in an expert report authored by a purported residual valuation expert

10  regarding other litigation); see also *United States v. Tran Trong Cuong*, 18 F.3d 1132, 1143 (4th

11  Cir. 1994) ("We also find it was error to allow Dr. MacIntosh to bolster his opinion evidence by

12  testifying that his conclusions as to Tran's actions were 'essentially the same' as those of a Dr.

13  Stevenson, who did not testify and whose report was not introduced into evidence. . . . The court

14  was aware that Dr. Stevenson was not going to testify and that his opinion as to the defendant's

15  files was not going to be submitted as evidence.  Therefore, the admission of MacIntosh's

16  statement as to Stevenson's report was clearly hearsay and prejudicial to the defendant");

17  *American Key Corp. v. Cole National Corp.*, 762 F.2d 1569, 1580 (11th Cir.1985) ("Expert

18  opinions ordinarily cannot be based upon the opinions of others whether those opinions are in

19  evidence or not"); *United States v. Grey Bear*, 883 F.2d 1382, 1392 -93 (8th Cir. 1989) ("[Rule]

20  703 does not permit an expert witness to circumvent the rules of hearsay by testifying that other

21  experts, not present in the courtroom, corroborate his views"); *6816.5 Acres of Land etc v. United*

22  *States*, 411 F.2d 834, 839-40 (10th Cir. 1969) (on retrial, "the trial court must take steps to

23  exclude any expert opinion that is predicated upon another opinion"); *Taylor v. B. Heller and*

24  *Co.*, 364 F.2d 608, 613 (6th Cir. 1966) ("expert opinion may not be based upon the opinion of

25  others, either in evidence or not in evidence").

26        In her export report, Graves states that two major time use experts, F. Thomas Juster and

27  Frank P. Stafford, opine that "written diaries are the only valid measurement of time use and that

28  it is not possible to get valid estimates of time use from questions which ask about an individual's

1    use of time over some specified period.[76]  Graves also states that "time use studies indicate that

2    the recall method for estimating non-market time (i.e. time not associated with a labor market job

3    and commute) associated with household services is unreliable and prone to exaggeration."[77]

4    Graves testified that this latter assertion was a direct quote from an article authored by Juster and

5    Stafford.[78]  She was quite clear, moreover, that these statements do not represent her opinions.

6    Graves explicitly stated that she was simply testifying to the opinions of Juster and Stafford as

7    detailed in their article.[79]  Because such testimony constitutes hearsay, it is inadmissible.  See

8    FED.R.EVID. 801(c), 802.

9            **b.**    **Even If Graves Were To Offer An Opinion, Her Testimony**

10                   **Would Not Be Admissible Because It Is Not Reliable**

11        Even if Graves were to offer an opinion that the recall method of estimating household

12   hours is unreliable, and that written diaries are the only valid measurement of time use, her

13

14

_____

15   [76]Pl.'s Graves Motion, Exh. A, (Expert Report of Catherine Graves) at 6.

16   [77]*Id.* at 8.

17

18   [78]RT at 14:11-21.  Graves presumably referenced the article by Juster and Stafford cited in her expert report, i.e., F. Thomas Juster & Frank Stafford, *The Allocation of Time: Empirical Findings, Behavioral Models and Problems of Measurement*, JOURNAL OF ECONOMIC LITERATURE 471 (June 1991).

19

20   [79]RT at 16:7-21 ("Q. Okay.  You say the recall method is biased; conversely, the written

21   diary approach is more accurate?  A. That's according to Juster and Stafford.  Q. Do you

22   believe that to be true?  A. I would like to rely upon these gentlemen as preeminent.  I do not, myself, get involved in time use studies.  Q. Do you have any reason to believe that their opinion

23   or the statement that you made in your report that written diaries are the only valid measurement of time use is incorrect?  A. Again, . . . there could be differences of opinion among various

24   time use experts.  These gentlemen, that is their opinion"); *id.* at 20:21 - 21:10 ("Q. Okay.  Now

25   you are also of the opinion that Juster and Stafford, in that report, came to the conclusion that the time diary method was more accurate than the recall method, correct?  A. That's what they said.

26   That's their quote.  Q. Okay.  A. It's not my conclusion.  It's what their statements are.  Q.

27   Do you know it to be false?  A. Do I know that their opinion is false? . . . [I]f that is their opinion, that is their opinion.  That is kind of an odd question to answer.  Q. Do you have any

28   reason to believe their opinion is incorrect.  A. No.  I believe it's their opinion").

1   testimony would still be inadmissible because Graves is not an expert on time use methodologies.[80]

2   Graves testified that she does not "get involved in time use studies,"[81] and that time use is

3   "obviously" not the emphasis of her expertise.[82]  Although it may be entirely proper for Graves

4   to rely on the results of time use studies in calculating the value of a person's household

5   production services, as she does in wrongful death and personal injury actions, it is quite another

6   thing for Graves to testify as to which time use methodology is the most reliable when she does

7   not profess to be an expert on the subject.

8   Moreover, the two scholars on whom Graves relies, Juster and Stafford, recently published

9   an article in December 2003 in which they concluded that the recall method may function as well

10   or better than the time diary method in at least two contexts:  (1) when activities take place

11   regularly and are structured externally (e.g., labor market work hours reported by those who are

12   regularly employed); and (2) when the analysis focuses on time trends rather than the level of

13   hours.[83]  It is unclear that these contexts are relevant to this case.  It is also unclear whether the

---

15   [80]Graves has not offered such an opinion to date.  At the hearing, defense counsel argued
16   that Graves had opined "that if the plaintiff gave her recollection some years later or some
    significant amount of time later, that those estimates of the amount of hours she worked would
17   be exaggerated."  (RT at 37:10-12).  In fact, Graves testified only that she had a difficult time
18   accepting a hypothetical posed by plaintiff's counsel, which assumed that Juster and Stafford had
    recently determined that recall studies that look back as much as three years were more reliable
19   and more accurate than diary studies.  (RT (Graves) at 32:25-33:7 ("Q. Same hypothetical and
    added to that that the three scholars determined that . . . recall studies which look back as much
20   as three years previously were more reliable and more accurate than diary studies, would that
21   change your opinion? A. You said to assume. I would like to see the study because I would have
    a difficult time accepting that as you have said it.  I believe it's overly broad, and I would like
22   to see how that really is, if you will, . . . their opinion").

23   [81]RT at 16:11-14 ("I would like to rely upon these gentlemen as preeminent. I do not,
24   myself, get involved with time use studies").

25   [82]Id. at 33:12-15 ("Well, again, what I have indicated is that I'm relying on other experts.
    I am not a – I do not focus my attention as a time use – that is not the emphasis, obviously of my
26   expertise").

27   [83]F. Thomas Juster, Hiromi Ono & Frank P. Stafford, *An Assessment of Alternative
28   Measures of Time Use*, SOCIOLOGICAL METHODOLOGY, 19, 43-44 (Dec. 2003).

1   article represents a repudiation of Juster and Stafford's earlier opinions, as plaintiff suggests. The

2   fact that Graves was not familiar with the article, however, which is one of Juster and Stafford's

3   most recent publications on the subject of time use methodologies, indicates that any opinion she

4   could offer would not rest on a reliable foundation.

5       In sum, because the opinions of Juster and Stafford constitute inadmissible hearsay,[84] and

6   because Graves is not an expert on time use methodologies, plaintiff's motion to exclude Graves'

7   household production testimony is granted.

8             **4.    Conclusion Regarding Graves's Testimony**

9       In sum, the court grants plaintiff's motion to exclude Graves' testimony regarding the

10  weekly value of room and meals provided to plaintiff, as well her household production

11  testimony.  Graves may testify to the amount of wages plaintiff is entitled to receive based on the

12  number of hours defendants contend plaintiff actually worked in the home.[85]

13      **G.    Motion *In Limine* To Limit Defendants' Experts To Rebuttal Testimony**

14      Lastly, plaintiff moves to limit defendants' experts to rebuttal testimony.  On October 26,

15  2003, the court issued an order setting case management dates.  The court set February 27, 2004

16  as the deadline for initial expert disclosures and March 26, 2004 as the deadline for rebuttal expert

17  disclosures.  Defendants' initial expert disclosures failed to comply with the requirements of Rule

18

---

19      [84]Stafford's and Juster's opinions might be admissible in some contexts.  Rule 803(18)

20  provides that "[t]o the extent called to the attention of an expert witness upon cross-examination
    or relied upon by the expert witness in direct examination, statements contained in published

21  treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art,
    established as a reliable authority by the testimony or admission of the witness or by other expert

22  testimony or by judicial notice" are not excludable hearsay.  "If admitted, the statements may be

23  read into evidence but may not be received as exhibits."  FED.R.EVID. 803(18).  This exception
    does not apply here, however, because Graves, who concedes she is not an expert on time use

24  methodologies, seeks to testify to Juster's and Stafford's opinions without offering an opinion of

25  her own.

26      [85]Plaintiff also argues that Graves' testimony should be excluded because she refused to

27  provide answers at her deposition and refused to answer a hypothetical question.  Having
    reviewed the deposition, the court need not address whether Graves' refusal was proper, as it did

28  not affect plaintiff's ability to obtain meaningful testimony.

1   26(a)(2) of the Federal Rules of Civil Procedure.  In an apparent attempt to compensate for this

2   initial failure, defendants' counsel "re-designated" the experts as rebuttal experts, and provided

3   their reports on March 26, 2004, the rebuttal expert deadline.  On April 5, 2004, plaintiff filed

4   a motion *in limine* to strike defendants' expert reports and preclude the experts from testifying at

5   trial.

6          The hearing on the motion was continued due to concerns that arose regarding defendants'

7   representation in the action.  On July 12, 2004, after the representational issues were resolved,

8   the court entered an order on a stipulation of the parties that stated: "The parties' expert

9   disclosures previously served in this case are hereby deemed timely.  The parties will have thirty

10  days from the date [this] order is entered to serve rebuttal reports. . . .  [T]his stipulation is

11  without prejudice to defendants moving to reopen expert designations.  Plaintiff will oppose any

12  such motion."[86]

13         Notwithstanding the language of the stipulated order, plaintiff contends that defendants'

14  experts can testify only as rebuttal experts because their reports so designate them.  Plaintiff

15  contends that if defendants intended to offer the witnesses as direct experts, they were required

16  to move to reopen expert designations.

17         The court disagrees with plaintiff's interpretation of the order. The order provided that all

18  previous disclosures would be "deemed timely."  Given that defendants' expert disclosures were

19  already timely if the witnesses were to be rebuttal experts only, the stipulated order, if it is to

20  have any effect, clearly operated to render them timely as original expert designations.  This is

21  evidenced by the fact that the order allowed the parties thirty days to designate rebuttal experts

22  and serve their reports.  The decision defendants' former counsel made to re-designate his experts

23  as rebuttal experts was nothing more than an attempt to compensate for his failure to designate

24  the witnesses and provide their reports in a timely fashion.  Accordingly, plaintiff's motion to

25  limit defendants' experts to rebuttal testimony is denied.

26

27  _____

28         [86]Stipulation And Order Re Motion To Compel Discovery, July 8, 2004, ¶ 1.

## II.  CONCLUSION

For the reasons stated, plaintiff's motion to exclude the testimony of Dr. Tricia Redeker Hepner is denied.  Plaintiff's motion to exclude the testimony of Dr. Sondra Hale is also denied. Consistent with this order, however, defendants may call either Dr. Redeker Hepner or Dr. Hale, but not both, to testify regarding the kinship structure of Eritrean society and the value placed on hospitality in the Eritrean culture.  Plaintiff's motions to exclude the testimony of Dr. John Rude and Dr. Tekie Fessehatzion are granted.  Plaintiff's motion to exclude the testimony of Catherine Graves is granted in part and denied in part.  Graves may not testify regarding the weekly value of room and meals provided to plaintiff, nor may she testify regarding time use methodologies. Graves may testify to the amount of wages plaintiff is entitled to receive based on the number of hours defendants contend plaintiff actually worked in their home.  Plaintiff's motion to limit defendants' experts to rebuttal testimony is denied.

DATED: February 15, 2005

_Margaret M. Morrow_
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE